## NATIONAL WILDLIFE FEDERATION, Petitioner,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 90–1072.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 28, 1990.

Decided Feb. 15, 1991.

Erik D. Olson, Washington, D.C., for petitioner.

Peter W. Colby, Atty., Dept. of Justice, with whom Barry M. Hartman, Deputy Asst. Atty. Gen., and Paul Bangser, Atty., E.P.A., were on the brief, for respondent.

Before MIKVA, Chief Judge, WILLIAMS and THOMAS, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

The Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f *et seq.* (1988), established a

state-federal partnership for the regulation of drinking water quality. The Environmental Protection Agency sets national drinking water standards; qualifying states are primarily responsible for their enforcement—they have, in the language of the trade, "primacy". As a part of this statutory scheme Congress set out the initial state primacy requirements, see 42 U.S.C. § 300g–2(a) (1988), and directed the EPA to prescribe by regulation the manner in which it would grant and withdraw state primacy, see 42 U.S.C. § 300g–2(b)(1) (1988). In 1989 the EPA revised its primacy regulations to allow a temporary stay of the primacy withdrawal process when a state fails to meet a deadline for conforming with new or revised national standards "for reasons beyond its control despite a good faith effort to do so", provided the state agrees to take certain corrective actions in the interim. See 40 CFR § 142.12(b)(2) (1990). While this "extension" is in effect, the EPA will enforce the new or revised standards, and the state will continue to enforce the standards with which its law conforms. The National Wildlife Federation claims that the effect of this regulation—the creation of periods of time during which primacy is split between the state and the EPA—is prohibited by the Act. We disagree. The agency's interpretation of the Act is reasonable and does not conflict with any intent expressed by Congress. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

\* \* \*

Two sections of the Act are relevant here. Section 1412, as amended in 1986, Pub.L. No. 99–339, 100 Stat. 642 (1986), directs the EPA to promulgate standards for drinking water filtration within 18 months from June 19, 1986, see 42 U.S.C. § 300g–1(b)(7)(C)(i), and to promulgate national primary drinking water standards for 83 (previously unregulated) contaminants, on a phased schedule of 12, 24 and 36 months from the same date, 42 U.S.C. § 300g–1(b)(1). Regulations of both types "take effect" 18 months after promulgation. 42 U.S.C. § 300g–1(b)(10). In addition, § 1412 provides that primacy states "shall adopt" regulations necessary to implement national filtration standards within 18 months of promulgation. 42 U.S.C. § 300g–1(b)(7)(C)(iii).

Under § 1413(a) of the Act, a state has primacy "during any period for which the [EPA]" makes a determination that the state satisfies certain requirements, including adoption of regulations that are no less stringent than the national primary drinking water regulations in effect under § 1412. 42 U.S.C. § 300g–2(a). Section 1413(b) instructs the EPA to promulgate regulations governing "the manner in which the [primacy] determination is made, the period for which the determination will be effective, and the manner in which [EPA] may determine that [the primacy] requirements are no longer met." 42 U.S.C. § 300g–2(b).

In 1976 the EPA adopted primacy regulations. 40 CFR § 142, Subpart B (1989). They provided that once a favorable primacy determination was made, state primacy was to "continue in effect unless terminated." *Id.* § 142.12(a)(3). There was to be an annual review of each state's compliance with the primacy requirements, *id.* § 142.12(b)(1), and if the review indicated to the agency that a state no longer met the requirements, the agency would notify the state, *id.* § 142.12(b)(2). A determination that the state no longer met the requirements would "become[ ] effective" only after a public hearing. *Id.* § 142.12(b)(4); § 142.13(a). This set of rules remained in effect through 1989.

In December 1989, in response to the 1986 statutory amendments, EPA revised the primacy regulations, with considerable focus on timing issues raised by the amendments. The new regulations require that a state, to retain primacy, adopt all new or revised national standards, and, upon doing so, submit a request to the EPA for approval of its program changes. See 40 CFR § 142.12(a)(1) (1990). Such requests are generally due "within 18 months after promulgation of the new or revised EPA regulations", *id.* at § 142.12(b)(1), a requirement that tracks § 1412(b)(10)'s provi-

sion that the new or revised regulations "take effect" 18 months after promulgation by the EPA. The regulations also include, however, a provision for a two-year "extension" of the deadline for filing such requests:

(2) The final date for submission of a complete and final State request for a program revision may be extended by EPA for up to a two-year period upon a written application by the State to [the EPA]. In the extension application the State must demonstrate it is requesting the extension because it cannot meet the original deadline for reasons beyond its control despite a good faith effort to do so. The application must include a schedule for the submission of a final request by a certain time and provide [other information as to such matters as the reasons for the delay and the state's satisfaction of certain interim requirements].

40 CFR § 142.12(b)(2). It is this possibility of extension that the Federation challenges here.

By itself the extension regulation merely extends a filing deadline. It takes on substantive meaning only when examined together with EPA's new section on primacy withdrawal:

When, on the basis of the [EPA] review or other available information, [EPA] determines that a State no longer meets the requirements [for primacy], *and the State has failed to request or has been denied an extension under § 142.12(b)(2) of the deadlines for meeting those requirements,* ... [EPA] **may** initiate proceedings to withdraw program approval.

40 CFR § 142.17(a)(2) (1990) (emphasis added). By implication, the primacy withdrawal regulation states that the *grant* of an extension of the filing deadline will cause it to *refrain* from initiating withdrawal proceedings.

The Federation initially petitioned for review of this regulation as well. Besides asserting inadequate notice and opportunity to comment, it claimed that the use of "may" asserted a limitless and unlawful

discretion over the initiation of withdrawal proceedings. Shortly before oral argument, however, this court granted EPA's request for a stay of proceedings as to those two challenges, to allow it to complete a new rulemaking. See Order filed November 21, 1990 (D.C.Cir. No. 90–1072). The primary justification for granting the motion was conservation of judicial resources, see *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), as the procedures carried the prospect of mooting the procedural attacks and of changing the substance to be reviewed. The new rulemaking also carries a theoretical possibility of mooting the attack on § 142.12, as EPA might conceivably delete § 142.17's cross-reference to § 142.12, leaving the changes in the extension regulation bereft of substantive effect. But as § 142.17 remains in effect pending completion of the new rulemaking, and EPA has given us no hint that its re-examination of § 142.17 will stray from the may/shall issue over into consideration of the reference to § 142.12 extensions, we find the challenge to § 142.17 ripe.

\* \* \*

In considering the Federation's attack on EPA's reading of the Act, we are first struck by the fact—conceded by the Federation at oral argument—that its own preferred approach would also involve "split primacy". Unless withdrawal proceedings could occur instantaneously on a state's failure to timely adopt the new regulations, the phase between initiation and completion of withdrawal proceedings will necessarily be one of split primacy. (Recall that primacy continues indefinitely "unless terminated." See 40 CFR § 142.12(a)(3).) In effect, then, the Federation's argument is that the Act contains indirectly expressed limits on the permissible duration of split primacy or the circumstances under which it can occur. It discerns these limits in Congress's stated conditions of primacy and, as to filtration standards, in its mandate that states adopt conforming regulations within 18 months of EPA promulgation.

The sole statutory provision of the Act dealing with primacy is § 1413, which provides in relevant part:

(a) ... [A] State has primary enforcement responsibility ... *during any period* for which [EPA] determines ... that such State ... has adopted drinking water regulations which are no less stringent than the national primary drinking water regulations in effect under sections [1412(a)] and [1412(b)] ...

(b)(1) [EPA] shall, by regulation ... prescribe the manner in which a State may apply to [EPA] for a determination that the [primacy] requirements ... are satisfied ... the manner in which the determination is made, the period for which the determination will be effective, and *the manner in which [EPA] may determine that such requirements are no longer met.*

42 U.S.C. § 300g–2 (1988) (emphasis added). This section mentions neither "extensions" or "stays", nor "full" or "split" primacy. It says merely that if a state at any given point in time adopts the then-promulgated national primary drinking water standards (and meets the other § 1413(a) criteria), and the EPA so finds pursuant to its primacy regulations, the state has primacy for a period determined by the EPA. Almost every state has met this initial hurdle. EPA Brief at 6 n. 6. The section says nothing about what happens when a primacy state misses the statutory deadline for enacting a new or revised national standard.

The best that the Federation was able to offer us as proof of congressional intention was the reference in § 1413 to the "regulations" of § 1412(a) and § 1412(b). It draws from this use of the plural form an inference that states must be ready to enforce *all* national standards at all times—all those deriving from the 1986 amendments to the Act (§ 1412(b)), as well as all those deriving from the pre-amendment Act (§ 1412(a)). That language may well suggest that members of Congress pictured adoption of all effective regulations as the norm. But it is coupled with the explicit anticipation that states would enjoy primacy "during any period for which" EPA made the requisite determination, as well as the broad grant of discretion to EPA to establish a system for grant and withdrawal of primacy. Given that context, we cannot find in § 1413 any direct congressional insistence that a state's primacy as to the standards with which its law conforms must cease the minute it fails to meet the deadline for adoption of a new standard.

We note that even if we accepted the Federation's reading of § 1413, the EPA's procedures are in literal compliance. Given initial primacy periods of indefinite length, even if EPA never started withdrawal proceedings, states would have primacy *only* during those periods "during which the [EPA] determines ... that such State has adopted drinking water regulations which are no less stringent than the national primary drinking water regulations" established under § 1412. See 42 U.S.C. § 300g–2(a) (1988).

Nor has the Federation cited anything in the legislative history supporting its drastic reading. To the contrary, the Federation's attack runs smack into one of the most clearly expressed congressional purposes—that the Act was to be primarily a state and locally run program.[1] The Federation's approach would be completely at odds with this purpose. As to any state that failed to respond to the Federation's proposed game of chicken by promptly adopting the new and revised regulations, all enforcement responsibility would shift to the EPA itself. Indeed, this suit's congruence with the Federation's beneficent environmental purposes seems to depend

---

1. See A Legislative History of the Safe Drinking Water Act 890 (U.S. G.P.O.1982) (remarks of Senator Hart) ("[T]he balance to be sought between the legitimate responsibility of the States to protect drinking water sources and *Federal backup enforcement* is a proper one. The States must assume primary responsibility for the implementation of the policies set out in this legislation. *The Federal Government obviously cannot police each and every drinking water supply system in this country.*") (emphasis added); *id.* at 649 (remarks of Representative Nelson); *id.* at 553 (H.R.Rep. No. 1185, 93rd Cong., 2d Sess., U.S.Code Cong. & Admin.News 1974, 6454).

either on EPA's winning that game or on its dramatically expanding its own staff.

The Federation's other statutory peg is § 1412's provision that a state with primacy "shall adopt" national filtration standards within 18 months of promulgation by EPA. § 1412(b)(7)(C)(iii). This may well support an action for non-compliance, including a private action under 42 U.S.C. § 300j–8(a), but it says nothing about the effect of noncompliance on primacy, or on EPA's discretion over the mechanics of primacy grant and withdrawal. And the challenged regulation clearly would not excuse state noncompliance with § 1412.

Finding no direct congressional preclusion of EPA's approach, we turn to its reasonableness. The Federation claims that the challenged regulation conflicts with EPA's longstanding and contemporaneous interpretation of the Act and that it jeopardizes effective enforcement. The first is just not so; the second goes to a point squarely within the agency's discretion.

As we have already made clear, the pre–1990 system of an indefinite grant of primacy and potential withdrawal after notice and hearing, combined with the possibility of tardy state adoption of new or revised regulations, carried with it the prospect of split primacy. Any EPA aspersions on split primacy must be viewed in that light—as qualified by the reality that it could easily occur. Indeed, the EPA has expressed itself in favor of full primacy in the past and concedes that that is still its general policy. EPA Brief at 30. But the instances in which it has rejected split primacy involved deliberate splits of unlimited duration, rather than (as here) interim splits expected to last only while state agencies or the EPA engaged in a kind of catch-up. See, e.g., 41 Fed.Reg. 2917 (1976) (discussing the primacy consequences of a state's *relinquishment* of enforcement responsibilities; 53 Fed.Reg. 37,403 (1988) (emphasis added) (in its notice of final Act regulations with respect to Indian tribes EPA noted that its policy "is to delegate primary enforcement responsibility for all program activities and not

allow partial program *delegations"*). Nor is this the first time that the EPA has expressly recognized its authority to sanction an interim split. In 1979 in response to concerns about its beefing up of the national standards, EPA, while recognizing that primacy states might be unable to meet statutory deadlines, agreed not to take action to withdraw primacy pending the establishment of new EPA [primacy] regulations, thereby "provid[ing] primacy States adequate time to amend their regulations without jeopardizing primacy." 44 Fed.Reg. 68,630 (1979). The Federation's contemporaneous interpretation argument simply sweeps too broadly, ignoring the relevant distinctions.

So far as effective enforcement is concerned, the extension regulation appears a quite rational response to the practical realities of safe drinking water enforcement. There are, of course, obvious reasons for generally favoring full state primacy. Split accountability entails some duplication of costs, and public confusion from divided enforcement could be significant. EPA Brief at 29–30. Moreover, *any* federal enforcement qualifies the congressional goal of state and local handling of local drinking water problems. But there is another side to that coin. If a state is the better enforcer of its local drinking water quality, but is temporarily unable to conform to a particular national standard for reasons beyond its control, what sense does it make for EPA to take over enforcement of the entire program? Section 142.12 is a quite narrow exception to EPA's general policy in favor of full state primacy, with extensions limited in time and dependent on good faith efforts to conform. See 40 CFR § 142.12(b). Furthermore, EPA's decision to allow extensions turns in significant part on issues we are ill suited to evaluate—the agency's allocation of its resources between direct enforcement of the Act and all other potential uses, and its predictions as to how states may respond to the various possible solutions. *See generally Heckler v. Chaney,* 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985); *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958)

(stressing multiplicity of relevant factors and consequent discretionary character of agency choice among remedies).

In sum, the EPA approach is not forbidden by the language of the enabling statute and appears a reasonable response to the difficulties of realizing conflicting congressional goals.

\*     \*     \*

The Federation also claims that the EPA's explanatory statement failed to address what the Federation now identifies as "the central issue" of the regulation, "how split primacy would work in practice and how EPA would be able to carry out split primacy obligations." Federation Reply Brief at 19; see also 5 U.S.C. § 553(c) (requiring "a concise general statement of [the rules'] basis and purpose"). The Federation is not altogether clear on just what it thinks was not addressed, summarizing its concerns as "immense logistical, legal, policy, resource, and other issues". Federation Brief at 40. Its Reply Brief identifies such specific issues as who would take samples during the period of split primacy and where citizens would go for relief. Reply Brief at 19 n. 34. So far as we can tell, the Federation's concerns fall into two categories—how will the EPA be able to deploy the necessary resources to provide the enforcement of whatever proves to be its share, and what will be the mechanics of that enforcement.

The irony of this claim is apparent. So far as EPA resources are concerned, there is no reason to suppose that the Federation's favored solution will require fewer. Without knowing in advance how states would respond to the draconian pressure it favors (as opposed to how they would respond to EPA's approach), there is no real way of knowing which strategy will entail the heavier burden for EPA. Strikingly, the Federation does *not* fault EPA for failing to venture a prediction, perhaps recognizing that it would at best have been a matter of informed guesswork. As the Federation identifies nothing in the record to suggest that the resource burden will be heavier under the agency's chosen plan, we see no need for the agency to have spoken to the point. Moreover, even if there had been reason to suppose a heavier resource burden, the issues of (1) *how* to meet it (i.e., from what existing enforcement activities EPA might have drawn the necessary resources), and (2) the resource trade-offs *between* policies involving a lesser or greater burden, are necessarily confided to the agency. *See Heckler v. Chaney*, 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). "Judges could make allocative decisions only by taking over the job of planning the agency's entire agenda...." *Board of Trade v. SEC*, 883 F.2d 525, 531 (7th Cir.1989). And while the requirement of a statement of basis and purpose serves not only to facilitate judicial review but also to enhance the rationality of agency decisionmaking, compare *Dunlop v. Bachowski*, 421 U.S. 560, 572, 95 S.Ct. 1851, 1860, 44 L.Ed.2d 377 (1975), a decision that basically arises out of a synoptic and partly intuitive grasp of the agency's entire workload hardly lends itself to articulation in § 553's "concise general statement of ... basis and purpose."

The minutiae of enforcement pose a rather similar problem: the Federation's approach would entail virtually the identical bureaucratic issues, except that there would be *no* state enforcement of any regulations, even the ones the disqualified state was fully qualified to enforce; thus, so far as the policy choice before the agency was concerned, the mechanics of enforcement were completely neutral. EPA's failure to discuss them is unimpeachable.

\*     \*     \*

Finding EPA's extension regulation a reasonable interpretation of the Act, not barred by any clear congressional determination to the contrary, and not procedurally deficient, we deny the petition for review.

*So ordered.*