NEW YORK STATE DEPARTMENT OF
LAW and The New York State Consumer Protection Board, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,

New York Telephone Company and New England Telephone and Telegraph Company, Intervenors.

ALLNET COMMUNICATION SERVICES, INC.,
Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,

New York Telephone Company and New England Telephone and Telegraph Company, Intervenors.

Scott J. RAFFERTY, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,

New York Telephone Company and New England Telephone and Telegraph Company, Intervenors.

Nos. 91–1362, 91–1367 and 91–1368.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1992.
Decided Feb. 9, 1993.

John E. Ingle, Deputy Associate General, F.C.C., with whom Robert L. Pettit, General Counsel, and Laurence N. Bourne, Counsel, F.C.C., Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, DC, were on the brief, for respondents.

E. Edward Bruce, Washington, DC, with whom Saul Fisher, White Plains, NY, were on the brief, for intervenors New York Telephone Co. and New England Telephone and Telegraph Co. Donald W. Boecke, Washington, DC, entered an appearance, for intervenors.

Before WALD, D.H. GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In 1990, the Federal Communications Commission ("FCC" or "Commission") brought an enforcement action against two wholly owned, regulated affiliates of the NYNEX Corporation ("NYNEX"). The FCC alleged that these two affiliates, the New England Telephone and Telegraph Company ("NET") and the New York Tele-

phone Company ("NYT"), violated FCC rules and policies designed to prevent regulated affiliates from overpaying nonregulated affiliates and passing those overcharges on to the ratepayers. Eight months after issuing an Order to Show Cause against these two affiliates, collectively the NYNEX Telephone Companies ("NTCs"), but without any public notice, the FCC and the affiliates entered into a Consent Decree under which the NTCs agreed to virtually all of the terms of the Order to Show Cause, and the FCC agreed to terminate all proceedings arising from that Order and not to institute any new proceedings based on the conduct that gave rise to the Order. The petitioners in this case, the New York State Department of Law ("New York petitioners"), Allnet Communications Services ("Allnet"), and Scott Rafferty, filed petitions for reconsideration with the FCC, asking it to repudiate the Consent Decree and reopen the show cause proceedings. The FCC's denial of those petitions is the subject of this appeal. Because we conclude that the FCC's decisions about the initial scope of the enforcement action and its decision to enter into the Consent Decree are committed to the agency's nonreviewable discretion, and because we find that the FCC did not violate the Administrative Procedure Act ("APA") or its own rules prohibiting *ex parte* contacts, we deny the petitions for review.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *General Background*

The FCC has recognized that an environment in which regulated and nonregulated affiliates engage in extensive transactions with one another presents dangers of cross-subsidization, that is, sales by the nonregulated affiliates at excessive prices to the regulated affiliates, which pass these excess costs along to the ratepayers. To guard against this danger, the FCC has adopted measures to scrutinize such affiliate transactions and to limit nonregulated affiliates' prices and profits on them by reference to the regulated entities' prescribed rates of return.

The transactions at issue in this case, which occurred between 1984 and 1988, come under two separate regulatory regimes. The reasonableness of affiliate transactions occurring from 1984 until April 1987 is determined subject to the requirement that affiliates record "just and reasonable" rates, 47 C.F.R. § 31.01–2(c) (1987), and to the basic principles established in *AT & T, Charges for Interstate Telephone Service*, Docket 19129 (Phase II), 64 F.C.C.2d 1 (1977) ("Docket 19129"). Under Docket 19129, the Commission first applies a rate of return or earnings comparison test, designating a price excessive if an unregulated affiliate's rate of return on an inter-corporation sale exceeds that permitted the regulated company. The Commission then applies a market comparison test, designating a price excessive if it exceeds "competitive benchmarks," that is, if the unregulated affiliate exceeds what others in the market charge. The Docket 19129 order indicates that these are independent tests providing two separate grounds for recovery. *See id.* paras. 208–09. Transactions occurring since April 1987 are analyzed according to the FCC's affiliate transaction rules, under which regulated corporations must meet the earnings comparison test for services purchased from nonregulated affiliates, and the market comparison test for assets purchased from them. 47 C.F.R. § 32.27(b) & (d).[1]

### B. *This Action*

#### 1. *The Order to Show Cause*

A routine audit by the FCC's Common Carrier Bureau of the transactions among NYNEX affiliates from 1984 through 1988 disclosed that the Material Enterprises Company ("MECO"), a wholly owned and nonregulated affiliate of NYNEX that does virtually all of its business with the NTCs, had overcharged them for products and

---

1. More specifically, transactions occurring between April 3, 1987 and December 31, 1987, are governed by the initial codification of these rules, 47 C.F.R. § 31.01–11, and transactions occurring from January 1, 1988 forward are governed by the current codification of the rules, 47 C.F.R. § 32.27.

services, and that the NTCs, in turn, had improperly passed on these inflated costs to their ratepayers. The audit further revealed that MECO's return on investment for these five years had far exceeded the allowable rate of return for regulated affiliates.

After examining the Common Carrier Bureau's facts, findings and recommendations, the FCC concluded that the NTCs "appear[ed] to have violated [the FCC's] affiliate transaction rules and policies over several years and that the audit report provide[d] a basis for initiating ... enforcement proceedings against NYNEX's regulated telephone companies." Order to Show Cause, *In the Matter of New York Tel. Co. & New England Tel. & Tel. Co.*, 5 F.C.C.Rcd. 866, 869 (1990) ("Order to Show Cause"). On February 6, 1990, the Commission ordered the NTCs to show cause why they should not be required to undertake four steps: (1) reduce capital account balances by $32.6 million to correct the artificially inflated capital and equipment carried on their books; (2) make a one-time reduction of $35.5 million to their interstate revenue requirements; (3) adjust certain annual forms for 1989 to correct inaccurate information from previous years; and (4) pay forfeitures of $1,419,000 for failing to account for their transactions with MECO as required by FCC rules.

The NTCs mounted an aggressive challenge to the FCC's action, claiming, among other things, that their transactions with MECO had violated no FCC rules and that, therefore, no forfeitures were justified; that the FCC could not predicate liability on the "just and reasonable" recording requirement in the absence of a knowing and willful padding of accounts; that the initial codification of the transaction rules had been voluntary and nonbinding; and finally, that the FCC was without authority to order refunds to ratepayers. Response of the NYNEX Telephone Companies, filed March 12, 1990.

2. *The Consent Decree*

On October 3, 1990, the FCC entered into a Consent Decree under which the NTCs agreed to all of the above terms, except that they were to make voluntary contributions to the U.S. Treasury in lieu of forfeitures. Consent Decree, *In the Matter of New York Tel. Co. & New England Tel. & Tel. Co.*, 5 F.C.C.Rcd. 5892 (1990) ("Consent Decree"). In exchange, the FCC agreed to terminate all proceedings arising from the Order to Show Cause and not to institute any new proceedings based on the conduct that gave rise to the Order. The Consent Decree stated that the FCC and the NTCs "agree[d] that the expeditious resolution of this proceeding in accordance with the terms of the Consent Decree is in the best interests of the public and the NTCs' ratepayers." *Id.* at 5893.

3. *Petitions for Reconsideration*

In November 1990, the petitioners filed with the FCC petitions for reconsideration, demanding that the agency repudiate the Consent Decree and reopen the show cause proceedings. The New York petitioners claimed to have recently obtained evidence showing that the FCC's earnings comparison test underestimated MECO's excessive pricing. They also complained that the FCC did not state an adequate reason for settling and that the settlement was not consistent with the FCC's statutory duty to enforce the Communications Act. Petitioner Rafferty challenged the FCC's actions "for the reasons stated" by the New York petitioners and on the additional ground that the agency addressed only past violations, not prospective relief. Finally, petitioner Allnet objected that the settlement negotiations between the FCC and the NTCs violated the Commission's *ex parte* communications rules and the APA's notice-and-comment requirements, and that the FCC had arbitrarily cut off its rights to seek relief against the NTCs through the complaint process.

In its June 4, 1991 order denying the petitions for reconsideration [J.A. 223], the Commission "stated in more detail [its] reasons for entering into the consent decree." Memorandum Opinion and Order, *In the Matter of New York Tel. Co. & New England Tel. & Tel. Co.*, 6 F.C.C.Rcd. 3303

(1991) ("Reconsideration Order"). It cited the "certainty of relief for consumers"; the obtaining of "immediate benefits for consumers while avoiding the delay, expense, and uncertainty that attends protracted litigation"; the fact that "the relief obtained by the consent decree was for all practical purposes the same as that which could have been obtained by a final order affirming the remedies in the Order to Show Cause"; and the agency's "exercise of [its] enforcement discretion." *Id.* at 3304, 3305. The consolidated petitioners ask this court to review the FCC's denial of reconsideration.

## II. DISCUSSION

Petitioners' objections boil down to four: They claim, first, that the Commission acted arbitrarily and capriciously by abandoning its show cause proceedings without notice and an adequate explanation; second, that in establishing the overcharges the Commission failed either to follow its own policies or to explain its departure therefrom; third, that the agency's settlement negotiations with the NTCs violated its own proscriptions against *ex parte* communications; and fourth, that in entering into the Consent Decree, the FCC violated the notice-and-comment provisions of the APA, 5 U.S.C. § 554(c) (1988). We address these objections in turn.

### A. *Nonreviewability of Enforcement Actions*

The first two challenges require an analysis of *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), which established the courts' unwillingness, except in limited circumstances, to second-guess an agency's enforcement decisions. In *Chaney,* the Supreme Court rejected a challenge by death row inmates to the Food and Drug Administration's ("FDA") failure to undertake an enforcement action to bar the state's use as a lethal injection of a drug that had not been approved for that purpose. The Court declined to review the FDA's decision, stating that an agency's decision not to bring an enforcement action was presumptively nonreviewable. The

Court cited three reasons: first, the decision involves a "complicated balancing of factors," including the likelihood of success and the best use of agency resources; second, when an agency refuses to act, it generally does not exercise coercive power over an individual's liberty or property rights; and third, an agency's decision to institute enforcement proceedings was analogous to prosecutorial discretion and should be accorded similar deference. *Id.* at 831–32, 105 S.Ct. at 1655–56. The Court cautioned, however, that the presumption of nonreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* It also noted the possibility that the presumption might not apply where the agency refused to institute proceedings on the mistaken belief that it lacked jurisdiction or where the agency had "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n. 4, 105 S.Ct. at 1656 n. 4 (citation omitted).

Under the rationale of *Chaney,* the FCC's actions in this case should be unreviewable. As a general matter, the FCC is best positioned to weigh the benefits of pursuing an adjudication against the costs to the agency (including financial and opportunity costs) and the likelihood of success; moreover, it is not exercising coercive power over an individual. Nor, as discussed below, does the FCC's statute provide sufficient standards to rebut the presumption. Finally, the FCC did not act under a mistaken belief that it lacked jurisdiction or "'consciously and expressly adopt[ ] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4 (citation omitted). In determining that the FCC's actions are nonreviewable, however, we are required to consider two specific issues not directly addressed in *Chaney:* the reviewability of an agency's decision to settle an enforcement action once initiated, and the reviewability of an agency's initial determi-

nation of the scope of an enforcement action.

### 1. Chaney *Applied to a Decision to Settle*

■ This case differs from *Chaney* in that it involves a decision to settle an enforcement action once begun, not a decision whether to initiate the action in the first place. We have previously recognized that, in some circumstances, an otherwise non-reviewable decision about initiating an enforcement action becomes reviewable once the agency undertakes the action. In *MCI Telephone Corporation v. FCC*, 917 F.2d 30 (D.C.Cir.1990), we remanded a tariff determination to the FCC because the agency raised an issue for investigation, held hearings on it, and then produced an order that failed to address the issue that the FCC itself had designated for inquiry. We stated:

> It is one thing for the FCC to decline to investigate a tariff in the first place; that decision is entrusted to its unreviewable discretion. It is quite another for it to note the importance of a question concerning a tariff, request and take evidence on the matter, and then "at that point change its mind, wiping out the hearing as though it had never occurred, and in effect decide that it will not enter upon a hearing."

*Id.* at 41–42 (citation omitted). We did not consider the FCC's actions in *MCI* a good faith exercise of the agency's enforcement discretion. Instead, we deemed its sole justification for abandoning the identified issues "inadequate" because it was based on a premise that "everyone involved knew, and ... the FCC had conceded at argument *it* knew" to be faulty. *Id.* at 41 (FCC refused to reach other issues concerning lawfulness of tariff options because it had held the options unlawful due to geographic restrictions, while knowing that those geographic restrictions would soon be eliminated) (emphasis in original).

This case can be easily distinguished from *MCI*. Here the FCC settled an enforcement action without resolving any of the legal issues raised in the Order to Show Cause initiating that action. In contrast, in *MCI* the FCC completed an adjudication on the merits of a contested case and reached a formal legal decision—a decision that did not invoke the agency's enforcement discretion in any way. (Indeed, neither the court nor even the agency thought *Chaney* sufficiently relevant to warrant mention in the opinion or brief respectively.) Review of such a decision, which is uniquely the role of the court, in no way impinges upon that discretion. *See International Union, United Automobile Aerospace & Agriculture Implement Workers of America v. Brock*, 783 F.2d 237, 244–46 (D.C.Cir.1986). In contrast, the FCC's decision to settle the enforcement action now before us resembles much more closely the discretionary decision to initiate an action, which is not reviewable under *Chaney*.

*Schering Corp. v. Heckler*, 779 F.2d 683 (D.C.Cir.1985), supports the view that an agency's decision to settle or dismiss an enforcement action is nonreviewable under *Heckler v. Chaney*. In *Schering*, we held that the FDA's decision to take a voluntary dismissal of an enforcement action and to agree not to file a new action for eighteen months "f[ell] squarely within the confines of *Chaney*." *Id.* at 685. We recognized the agency's need to strike enforcement deals even after having initiated enforcement:

> Schering concedes that *Chaney* would bar review here if the FDA had decided not to prosecute ... in the first place, and had memorialized that decision in a written opinion, or even if the FDA had brought an enforcement action but then unilaterally abandoned it. Admittedly the agency went further than that in this case, and assured [the alleged offender] that it would be free from prosecution for at least 18 months. But this action simply represents the *quid pro quo* that the agency found necessary to procure [the party's] abandonment of its declaratory judgment claim. We can no sooner question the soundness of this bargain than we could a unilateral agency decision not to prosecute *ab initio* ....

*Id.* at 687; *see also Franklin v. Massachusetts*, — U.S. —, —, 112 S.Ct. 2767,

2784, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring) (citing *Chaney* as applying to an agency's "refusal to *pursue* enforcement actions") (emphasis added).

In *Schering*, we cautioned, however, that not every agency settlement, whatever its terms, is unreviewable. Noting that the FDA had reasons to delay its decision on the status of the drug in question, we concluded that the "agreement embodie[d] a legitimate exercise of enforcement discretion." *Id.* at 686. The FCC's actions in this case are similarly a legitimate exercise of that agency's enforcement discretion.

Moreover, the presumption of nonreviewability that we apply to this decision to settle is not rebutted by the FCC's substantive statute, *see Chaney*, 470 U.S. at 831–32, 105 S.Ct. at 1655–56 which provides the agency broad discretion in enforcement decisions. Even had the FCC completed adjudication of these overcharges, it would have been free to decide, at its discretion, not to collect every dollar to which it was entitled. 47 U.S.C. § 504(b) (1988) (authorizing the FCC "to remi[t] or mitigat[e]" the forfeitures that it has adjudicated "under such regulations and methods of ascertaining the facts as it may deem advisa-

ble)." Congress intended that the exercise of this authority be "solely a function of the Commission's discretion." S.REP. No. 580, 95th Cong., 1st Sess. 25 (1977).[2] We can see no reason for the FCC to have less latitude in the early stages of an enforcement action than after its completion. Certainly the statute does not lay out any circumstances in which the agency is required to undertake or to continue an enforcement action.[3] We conclude, therefore, that the FCC's decision to enter into the Consent Decree with the NTCs is nonreviewable under *Chaney*.[4]

### 2. Chaney *Applied to the Selection of Remedy*

■ The petitioners' second challenge is to the Commission's failure either to follow its own policies in establishing the overcharges or to explain its departure therefrom. Petitioners support their argument in two ways. First, they note that, under Docket 19129, the Commission could have sought recovery under two separate and complementary measures, the rate of return comparison and the competitive benchmark test. Second, they read the Order to

---

2. Pursuant to that authority, the FCC has enacted *regulations providing that it may negotiate a* consent order "[w]here the interests of timely enforcement and compliance, the nature of the proceeding, and the public interest permit." 47 C.F.R. § 1.93(b). Negotiations leading to a consent decree may be undertaken either before or after a matter has been designated for a hearing. 47 C.F.R. § 194(a) and (f).

3. The statutory standards are somewhat different, however, when the agency is responding to a complaint, rather than initiating action on its own. *See* 47 U.S.C. §§ 207–208; *see also infra* note 8. Even in these circumstances, however, the statute requires only that the Commission investigate the matter, if appropriate, and respond, not that it undertake any enforcement action.

4. Since we decide that these enforcement decisions are nonreviewable, we do not need to address whether any of the petitioners have satisfied the exhaustion requirement as to these claims by "show[ing] good reason why it was not possible ... to participate in the earlier stages of the proceeding." 47 C.F.R. § 1.106(b)(1); *see also Office of Communication of the United Church of Christ v. FCC,* 911 F.2d

803, 808 (D.C.Cir.1990) ("Interested persons seeking to participate in FCC proceedings are required to join the proceedings at the earliest opportunity."). In its Reconsideration Order, the Commission found that the New York petitioners' claim of newly-discovered evidence provided at least "some support" for its claim that it was not possible to intervene earlier, but that Allnet had no excuse for its failure to do so. Reconsideration Order, 6 F.C.C.2d at 3304 (para. 8). The FCC, however, citing the "public interest," declined to dismiss either petition. *Id.* (para. 9). It then argued to this court that its "discretionary decision" to address these petitions did not waive the exhaustion requirement as to these claims, and that petitioners were therefore not entitled to be heard on appeal.

Based on our conclusion that the scope of the Commission's enforcement action was clear from its Order to Show Cause, and recognizing that the relief set forth in the Order was the maximum relief the Commission could obtain in the proceeding, *see* 47 C.F.R. § 1.80(f)(4), we, too, question why the petitioners did not intervene in the proceedings during the eight months between the issuance of the Order and the signing of the Consent Decree. Our determination under *Chaney,* however, obviates any need to settle this question.

Show Cause as promising, or at least suggesting, recovery under both theories. They point to the Order's discussion of the background and evolution of the Commission's affiliate transaction policies and rules, in which the Commission acknowledges that Docket 19129 established a "formal policy governing affiliate transaction pricing and profits" that "served as the cornerstone of the Commission's policy governing affiliate transactions prior to the adoption of formal rules." Order to Show Cause, 5 F.C.C.Rcd. No. 4, at 866. This discussion, argue the petitioners, signals the Commission's intention to recover from the NTCs under both the rate of return comparison and the competitive benchmark test.

■ Taking these points in order, we agree that the FCC was entitled to seek recovery on both grounds. In effect, the agency had two arrows in its quiver and chose to draw only one. It is not within our purview to review that choice. Where an agency determines, for whatever reason, that it has a greater chance of recovery under one measure alone or that its resources are best devoted to pursuing recovery under that measure, it should be free to proceed under that calculation, absent a statutory requirement to the contrary. Here, for example, to ensure that MECO's excessive charges were not passed on to the ratepayers, the Commission elected to limit MECO's rate of return to that prescribed for the NTCs, but not to undertake the additional, more cumbersome transaction-by-transaction analysis required by the market comparison test. We are not willing to say that, while the FCC was not required to undertake enforcement under either theory, it is not permitted to proceed under one without the other. Mandating such an all-or-nothing approach to enforcement would discourage many responsible and fruitful enforcement actions and would permit a court to reopen an enforcement action whenever an agency may have (intentionally or accidentally) understated its grounds for recovery, a regulated entity's overall liability, or the likelihood of litigation success. Such agency enforcement decisions, which often turn on

careful calculations about finite resource allocation, are ill-suited to judicial oversight. *Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. at 1655 ("An agency decision not to enforce often involves a complicated balancing of a number of factors, ... [including] whether the agency resources are best spent on this violation or another, whether the agency is likely to succeed if its acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 423 (D.C.Cir. 1992) (citing *Chaney* for the proposition that "courts generally lack authority to review agency's enforcement agenda and resource-allocation decisions"); *National Wildlife Fed'n v. EPA*, 925 F.2d 470, 474 (D.C.Cir.1991) (citing *Chaney, supra; Moog Indus., Inc. v. FTC*, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958) (an agency's decision to permit extensions "turns in significant part on issues we are ill suited to evaluate—the agency's allocation of its resources between direct enforcement ... and all other potential uses, and its predictions as to how [others] may respond to the various possible solutions."); *Coker v. Sullivan*, 902 F.2d 84, 89 (D.C.Cir. 1990) (citing *Antone v. Block*, 661 F.2d 230, 234 n. 6 (D.C.Cir.1981)) ("We have previously expressed hesitation to position this court as supreme supervisor of federal agency enforcement, a role more effectively performed by the Executive under congressional scrutiny."); *see also Board of Trade v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989) ("Judges could make allocative decisions only by taking over the job of planning the agency's entire agenda....").

As we have stated, had the FCC initiated and fully adjudicated an enforcement action based on *both* theories, its statute would have given it discretion to remit or mitigate any resulting forfeitures. *See* 47 U.S.C. § 504(b); *see also* 47 C.F.R. § 1.80(h)(1) ("In its discretion, the Commission ... may remit or reduce any forfeiture imposed under this section."). This means that it could have, for example, collected

under the rate of return test and remitted the forfeitures adjudicated under the price comparison test. Although some exercises of this broad discretion to forego forfeitures could arguably be so extreme as to "amount to an abdication of [the FCC's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4 (citation omitted), that is certainly not the case here. Nor does the discretionary language of this substantive statute provide sufficient guidelines to rebut the presumption of nonreviewability. *See id.* at 831–32, 105 S.Ct. at 1655–56.

■ As to petitioners' second point, we differ on how the Order to Show Cause should be characterized. We read its background discussion of Docket 19129 to indicate only that recovery under both theories was *available*. The rest of the Order reflects the Commission's decision from the outset to seek recovery under only the rate of return comparison. Significantly, the FCC's calculation of overcharges was based solely on the rate of return comparison. Moreover, the Order stated that the FCC had previously approved the NYNEX affiliates' use of a "fully allocated costs" pricing policy, which signals the FCC's focus on the rate of return comparison. *Id.* at 868. It also referred to the effectiveness of the agency's policies and rules in limiting MECO's earnings "to the allowable return of the regulated telephone companies," *id.* at 870, again reinforcing its focus on the rate of return comparison.

Even were we to concede that there were ambiguities in the Order to Show Cause, the petitioners have not persuaded us that the Commission undertook a binding obligation to seek recovery under both theories. Accordingly, we decline to second-guess the agency's choices concerning the scope of this enforcement action.

## B. Ex Parte *Communications*

■ The petitioners' third challenge to the FCC's action is based on a claim that the settlement negotiations between the agency and MECO violated the agency's own ban on *ex parte* communications. We conclude, however, that the communications fall within an exception to the ban that permits *ex parte* communications initiated by the FCC for the resolution of issues in a proceeding that has not been designated for a hearing.

The FCC's rules prohibit *ex parte* contacts in "restricted" proceedings. 47 C.F.R. § 1.1208(a). An "order to show cause proceeding" in which a party has formally opposed another party's position is a restricted proceeding. *Id.* § 1.1208(c)(1)(B). A written contact is considered *ex parte* if it is not served on the "parties to the proceeding," while an oral contact is *ex parte* if the agency fails to provide "the parties to the proceeding" with "advance notice and an opportunity to be present." *Id.* § 1.202(b)(1) & (2).

Thus, the Commission violated its *ex parte* rules only if this was a restricted proceeding and the agency failed properly to communicate with a "party" to the proceeding. Of the petitioners, only petitioner Rafferty intervened in the show cause proceeding before the Consent Decree was entered into, so only he has any claim to being a "party" under the FCC's *ex parte* rules. On March 14, 1990, he filed with the FCC a motion to "Affirm NYNEX's Liability for Forfeitures." Although the NTCs challenged whether this motion, which gave a qualified endorsement to the FCC's proceedings,[5] could be termed formal opposition to either party's position so as to transform the proceeding into a restricted one, the FCC concluded that it did. Reconsideration Order, 6 F.C.C.Rcd. at 3308 n. 23.

Even accepting that the proceeding was restricted, the challenged settlement discussions were nonetheless permissible, as they fall within an exception to the bar on *ex parte* contacts for communications "re-

---

**5.** The motion generally applauded the Commission's pursuit of overcharges from the NTCs, asking it to "affirm and enforce its Forfeiture Notice," and encouraging it not to "dilute the proposed forfeitures without giving interested parties an opportunity to provide information in support." It did, however, claim that MECO's overcharges exceeded the proposed remedy, which it termed "extremely modest."

quested by the Commission or staff for the clarification or adduction of evidence or for the resolution of issues, [where] the proceeding ... has not been designated for a hearing...." *Id.* § 1.1204(b)(7). Here, the Commission initiated the settlement negotiations for the "resolution of issues," and the proceeding had not been designated for a hearing, as the FCC has interpreted that term. *See, e.g., In the Matter of Jack A. Thompson, Jr.,* Order to Show Cause and Hearing Designation Order, 7 F.C.C.Rcd. 2130 (1992); *In the Matter of Quests, Inc.,* Order to Show Cause and Hearing Designation Order, 5 F.C.C.Rcd. 6559 (1990). One purpose of this exemption, according to the FCC, is "to avoid 'constraints upon agency staff in ... attempting to reach settlement agreements....'" Reconsideration Order, 6 F.C.C.Rcd. at 3305 (citing *Notice of Proposed Rulemaking,* FCC 86–284, at 12, para. 24, released July 9, 1986 *(Ex parte Notice), summarized at* 51 FED. REG. 26,278 (1986)). Consistent with this exemption, the Commission has enacted rules providing for informal, private settlement procedures. *See* 47 C.F.R. § 194(f) (agency may enter into consent decrees by "informal settlement" where proceeding has not been designated for a hearing); *id.* § 194(g) (even where matter has been designated for a hearing, "[n]egotiating papers .... are not routinely available for public inspection"). We defer, as we must, to the Commission's consistent and reasonable interpretation of its own regulations, *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and accordingly conclude that the agency did not violate its *ex parte* rules.

**6.** Section 205 of the Communications Act, 47 U.S.C. § 205(a), has been held to require a formal public hearing for setting tariffs or practices, but not for adjudications. *See W.U. Tel. Co. v. FCC,* 665 F.2d 1126, 1151–52 (D.C.Cir.1981) (evidentiary hearing not required when agency making policy, not setting rates); *New York Tel. Co. v. FCC,* 631 F.2d 1059 (2d Cir.1980) (Commission not required to hold hearing where its order did not abrogate tariff currently on file); *AT & T v. FCC,* 572 F.2d 17, 22–23 (2d Cir.)

## C. *APA Notice-and-Comment Requirements*

■ We can briefly dispose of the petitioners' claim that the settlement discussions leading to the Consent Order violated the notice-and-comment provisions of the APA. Petitioner Allnet claims that the APA "single[s] out settlement discussions and related proposals as requiring public disclosure and opportunity for comment and/or involvement." We disagree.

Section 554(c) of the APA provides that an agency "shall give interested parties the opportunity for—(1) the submission and consideration of facts, arguments, *offers of settlement,* or proposals of adjustment when time, the nature of the proceeding, and the public interest permit...." 5 U.S.C. § 554(c) (emphasis added). This provision is inapplicable here for two reasons. First, it applies only to adjudications "required by statute to be determined on the record after opportunity for an agency hearing...." 5 U.S.C. § 554(a). Petitioners have cited no statute requiring the FCC to conduct this proceeding on the record or after a hearing.[6] The FCC's own regulations similarly leave open the question of when to designate an enforcement action for a hearing. *See* 47 C.F.R. § 1.93(b).

■ Second, even if this proceeding did come within § 554(c), the statute does not automatically require the FCC to give notice to interested parties of settlement discussions occurring at this point. Under the text of the statute itself, the notice and opportunity requirement applies only when "time, the nature of the proceeding, and the public interest permit...." 5 U.S.C. § 554(c). The legislative history of this provision makes clear that "even when formal hearing and decision procedures are available to parties, the agencies and par-

(where statute does not require hearing "on the record," APA does not require trial-type evidentiary hearing), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978); *AT & T v. FCC,* 487 F.2d 865 (2d Cir.1973) (Commission can prescribe or determine rates only after a hearing). Nor does § 409 of the Act mandate a full hearing on the record, as it merely prescribes procedures for those adjudications that are designated for a hearing. 47 U.S.C. § 409.

ties are authorized to undertake the informal settlement of cases ... *before undertaking* the more formal hearing procedure...." S.Doc. No. 248, 79th Cong., 2d Sess. 24 (1945) (emphasis added). Moreover, the "precise nature of [such] informal procedures" was left to the agencies. *Id.* Consistent with this directive, § 4(j) of the Communications Act gives the Commission discretion to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j) (1988). *See also FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940) (under § 4(j), "the subordinate questions of procedure in ascertaining the public interest ... were explicitly and by implication left to the Commission's own devising"); *Action on Safety and Health v. FTC,* 498 F.2d 757, 762–63 (D.C.Cir.1974) (agency's power to prescribe consent negotiation procedures is committed to agency's discretion and not subject to judicial review). We are convinced that the FCC's decision to conduct these settlement negotiations in private was fully consistent with the discretion it is granted under the APA.[7]

Having so concluded, we venture to add that the concerns that led Allnet to make this challenge appear misplaced. Allnet feared that, by entering into the Consent Decree, the FCC abridged the rights of third parties under the Communications Act to file complaints with and get a re-

sponse from the FCC.[8] Allnet's concern stemmed from the Consent Decree's provision that the Commission "will not institute any new proceedings of any kind arising out of conduct on which the Order to Show Cause and underlying audit are based or other conduct associated with those matters and occurring during the time period covered by the Order to Show Cause and the underlying audit." Consent Decree, 5 F.C.C.Rcd. at 5894 (para. 7). Allnet read this provision to prohibit it and other parties from filing complaints with the FCC and receiving additional recovery against the NTCs based on overcharges occurring during the period at issue.

Based on the Commission's assurances in its Reconsideration Order and on extensive discussion of this issue in oral argument, we conclude, along with the FCC, that Allnet "overstate[s] the scope and effect of the settlement language contained in the consent decree." Reconsideration Order, 6 F.C.C.Rcd. at 3306 (para. 28). The Commission has insisted that its pledge not to *institute* proceedings does not limit its ability or responsibility to *respond* to pending or future complaints raised by third parties. *See* Reconsideration Order, 6 F.C.C.Rcd. at 3306 (para. 26) ("the consent decree did not abridge the rights of third persons concerning pending or future Section 208 complaints about the NTCs' affiliate transactions"); *id.* (para. 28) ("the settlement in no way impedes our ability to address any other violations of the Commu-

---

7. Since we conclude that the APA did not require that the FCC give notice and an opportunity to comment to "interested parties," we do not reach the question of whether Allnet would so qualify.

8. Sections 207, 208 and 209 provide, in part:

§ 207. **Recovery of damages.** Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may ... make complaint to the Commission....

§ 208. **Complaints to Commission; investigations; duration of investigation; appeal of order concluding investigation.**

(a) Any person, any body politic or municipal organization, or State commission, complaining of anything done or omitted to be done by a common carrier ... may apply to

said Commission ... whereupon a statement of complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint or to answer the same in writing within a reasonable time to be specified by the Commission.... If ... there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate matters complained of in such manner and by such means as it shall deem proper....

§ 209. **Orders for payment of money.** If, after hearing on a complaint, the Commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter, the Commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named.

nications Act or our rules by the NTCs, even if such violations raise issues similar to those presented in this proceeding (*i.e.*, alleged overcharges by affiliates and improper accounting for affiliate transactions)"). Counsel for the FCC reiterated at oral argument that other claims are not foreclosed, and that the FCC was still obligated to consider those complaints. *See* 47 U.S.C. §§ 207–209.

Thus, according to the FCC, the settlement's only impact on § 208 proceedings would be that "to the extent the relief complainants seek has been received through the terms of the consent decree, complainants must show additional facts and prove greater harm to obtain further relief." Reconsideration Order, 6 F.C.C.Rcd. at 3306 (para. 26). As the FCC's counsel explained at oral argument, any ratepayer who files a complaint against the NTCs will already have received some benefit from the Consent Decree, and so any additional recovery would have to be offset to reflect that benefit. The complainant might still recover, however, for any damages above and beyond those compensated by the Consent Decree, including damages stemming from excessive purchase prices. We share this reading of the Consent Decree, which respects both the interests of the NTCs in knowing that the issues settled in the Consent Decree are, in fact, "settled," and the statutory rights of third persons to file complaints with the FCC and, where warranted, to obtain relief.

### III. CONCLUSION

■ Not every agency settlement, whatever its terms or whenever it occurs, escapes review under *Chaney*. For instance, an agency's initiation of an enforcement action may trigger certain substantive obligations under the agency's statutes, the violation of which might trigger judicial review, *see Chaney*, 470 U.S. at 831, 105 S.Ct. at 1655, or an agency's consistent policy of nonenforcement might be "so extreme as to amount to an abdication of its statutory responsibilities," *id.* at 833 n. 4, 105 S.Ct. at 1656 n. 4. In this case, howev-

er, the FCC possessed and legitimately exercised its considerable discretion to enforce its affiliate transaction policies and rules. It is not the courts' province to disturb the agency's decisions reached pursuant to that discretion. Since we are not empowered to review the merits of the FCC's enforcement decisions, and since we find no procedural violations, the petitions for review are

*Denied.*